Filed 5/24/24  Perez v. Century Indemnity Co. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RAQUEL PEREZ et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>CENTURY INDEMNITY COMPANY et al.,<br><br>　　　Defendants and Respondents. | A167536<br><br>(Alameda County<br>Super. Ct. No. RG19025399) |

The family of Antonio Perez, Sr., who died in 2015 of mesothelioma caused by workplace exposures to asbestos, appeal a summary judgment in favor of two insurance companies.  In the 1980s, the companies provided insurance to Universal Fleet Supply, Inc. (Universal), which sold asbestos-containing brakes to Perez's employer.  In 2003, Universal's corporate powers were suspended.

When Perez fell ill in 2013, plaintiffs filed a personal injury action against Universal, followed in 2016 by a wrongful death action.  Each was tendered to the insurers.  They declined to provide a defense, asserting plaintiffs' claims fell within a policy exclusion.  Plaintiffs then secured default judgments against Universal totaling $41,000,000.

Plaintiffs next filed the present action against the insurers.  They asserted a direct cause of action to recover on the judgments up to the policy

1

limits. (Ins. Code, § 11580.) They also asserted causes of action assigned to them by Universal for bad faith denial of coverage, by which they sought to recover the full amount of the judgments.

The trial court granted summary judgment in favor of the insurers. It held that Universal, as a suspended corporation, lacked capacity to assert the bad faith claims; that plaintiffs, as its assignees, suffered the same incapacity; and that the limitations periods on the claims had thus expired. As for the direct claims, the court held they were barred by policy exclusions. We will affirm.

## BACKGROUND

### I.

### *Underlying Alleged Facts*

In the 1980s, Perez worked as a container chassis mechanic on the Oakland waterfront. His employer from 1982 to 1987, Transport System Services (Transport), purchased brakes with asbestos-containing pads from Universal. Universal employees delivered the brakes in a van. The brakes were often on a pallet, packed "pad to pad." As the van vibrated in transit, the pads rubbed together, releasing asbestos fibers.

Perez often unloaded brakes from Universal's delivery vans. Transport's facility was on a very windy estuary. When Perez would open the delivery vans' back doors, the wind would blow asbestos dust onto him. When he stepped into the vans to unload the brakes, he was further exposed to asbestos the brakes had released in the van. He also was exposed to asbestos by working with the brakes. The exposures were substantial factors contributing to his risk of developing mesothelioma.

For four years in which Perez was thus exposed, Universal had a primary insurance policy and either an excess or an umbrella policy (jointly

2

secondary policy) issued by Century Indemnity Company and Ace Property & Casualty Insurance Company (the insurers). The policy limits for the four years total $6 million.

Each primary policy had an exclusion for harm caused by Universal's "products," defined as products it had "turned over to others." Each secondary policy had a similar exclusion for harm arising from "products hazard," defined as harm occurring "after physical possession of such products has been relinquished to others." Each primary policy also had an exclusion for harm arising from "use, maintenance, repair, or loading or unloading" of an automobile, while each secondary policy had an exclusion for "completed operations hazard," including harm arising "out of a condition in or on a vehicle created by the loading or unloading thereof." (We refer to the products and product hazard exclusions collectively as the product exclusions and the automobile use and completed operations hazard exclusions collectively as the vehicle exclusions.)

In 2003, Universal's corporate powers, rights, and privileges were suspended for nonpayment of taxes. (See Rev. & Tax. Code, § 23301 (section 23301).)

## II.

### *The Underlying Actions and Default Judgments*

Plaintiffs[1] pursued two actions against Universal: one for personal injury filed in 2013 while Perez was still alive, and one for wrongful death filed after Perez died in 2015.

---

[1] In the personal injury action, the plaintiffs were Perez and his wife; in the wrongful death action and this action, the plaintiffs are his widow and children. The distinction between the plaintiffs in the various actions has no effect on any issue on appeal. For simplicity, we use the term "plaintiffs," without distinction, to refer to the plaintiffs in all three actions.

3

## A.  The Personal Injury Action

In 2013, Perez was diagnosed with mesothelioma.  He and his wife filed a personal injury action against Universal and others, claiming that exposure to asbestos from their products caused his mesothelioma.  Two paragraphs of the complaint are relevant here.  One alleged that Perez "was exposed to asbestos-containing dust from the inspection, adjustment, maintenance, repair, installation and replacement of asbestos-containing friction materials on container chassis" at workplaces including Transport (paragraph IX).  Another alleged more broadly that in "the course and scope of his attendance and work, [Perez] was exposed to asbestos products and asbestos-related materials of defendants, which . . . proximately caused him to develop . . . mesothelioma" (paragraph X).

In 2014, Ron Short, a former vice president of Universal, tendered the personal injury action to the insurers.  The insurers declined to provide a defense, citing the products exclusions.

Universal defaulted, and plaintiffs filed a request for entry of a default judgment.  Shortly before a June 2015 prove-up hearing, plaintiffs submitted supplemental or amended declarations that described a theory of exposure which had not been articulated in the complaint.  Plaintiffs contended Perez was exposed to asbestos fibers from Universal's brakes not only when installing, repairing, and replacing them, as alleged in paragraph IX, but also as he prepared to unload them from Universal's delivery van.  At the prove-up hearing, plaintiffs offered supporting testimony from Perez's coworker Everett Darwin.  Darwin described how, when Perez opened the door of and entered the van, he was exposed to asbestos that had been released as the brakes, packed in the van "pad to pad," rubbed together in transit.

4

The trial court entered a default judgment against Universal in June 2015 for nearly $19.5 million (later modified to roughly $19.3 million to reflect credits for plaintiffs' settlements with other defendants). The judgment described the complaint as alleging that Universal supplied asbestos brake products; that its brakes came in contact with Perez and his coworkers; that Perez " 'was exposed to asbestos-containing dust from the inspection, adjustment, maintenance, repair, installation and replacement' of Universal's 'asbestos-containing friction materials' "; and that the exposures " 'caused him to develop' mesothelioma." The judgment stated, "Universal's failure to answer the complaint, allowing instead its default [to] be taken, constitutes an 'admission' of these material facts." A section headed "Liability Evidence" stated, among other things, that on "numerous occasions," Perez "helped unload Universal's dusty brakes when they were delivered." A section headed "Findings" stated, "On liability, the Court accepts the truth of plaintiffs' factual allegations and finds that those allegations are supported by the evidence presented at the hearing (as summarized above)."

## B. The Wrongful Death Action

Perez died in September 2015. In 2016, his widow and children filed a wrongful death action against Universal. The insurers again declined to provide a defense, citing the product exclusions. Universal again defaulted, and plaintiffs requested entry of a default judgment "under principles of issue preclusion" based on the personal injury judgment.

In June 2017, the trial court entered a default judgment. It described the wrongful death complaint as alleging Universal "supplied brake products that exposed . . . Perez to asbestos" in a way increasing his risk of mesothelioma, and it held that Universal's default "constitutes an 'admission' of these material facts." Under "Findings," the judgment stated, "On liability,

5

this Court accepts the truth of Plaintiffs' factual allegations and [of] the findings set forth in the Amended Default Judgment" in the personal-injury action. The court awarded plaintiffs just over $22 million in damages.

<h1 style="text-align:center">III.</h1>

<h2 style="text-align:center"><i>The Present Action</i></h2>

On July 1, 2019, Universal purportedly assigned to plaintiffs any claims it had against the insurers for breach of the implied covenant of good faith and fair dealing based on their refusal to defend the personal injury and wrongful death actions. On the same date, plaintiffs filed this action against the insurers.

The operative third amended complaint, filed in 2021, asserted two direct causes of action and three assigned causes. The direct claims sought recovery on the default judgments up to the relevant policy limits (Ins. Code, § 11580, subd. (b)) and damages for the insurers' refusal to pay the default judgments against their insured, which assertedly made the insurers liable for the fees and costs plaintiffs incurred to enforce those judgments. (See *Brandt v. Superior Court* (1985) 37 Cal.3d 813.) The assigned claims sought damages for the insurers' breach of the duty of good faith and fair dealing owed to Universal based on their failure to defend and settle the underlying actions.

### A.  Summary Adjudication of the Assigned Causes of Action

In November 2021, the insurers moved for summary adjudication of the assigned causes of action based on the statute of limitations. The insurers contended that at the time plaintiffs filed this action in July 2019, the suspension of Universal's corporate privileges deprived it of capacity to sue and plaintiffs, as Universal's assignees, stood in its shoes and also lacked capacity to assert the assigned claims. The limitations periods on Universal's

6

claims had thus expired in November 2019 (as to the personal injury judgment) and September 2021 (as to the wrongful death judgment). The trial court granted the insurers' motion.

### B. Summary Judgment Disposing of the Direct Causes of Action

In 2022, the insurers and plaintiffs filed cross-motions for summary adjudication or judgment as to the direct causes of action for the amounts of the judgments up to the policy limits, and for plaintiffs' fees and costs. The insurers relied on the product and vehicle exclusions. The trial court granted their summary judgment motion and denied plaintiffs' motion. It concluded plaintiffs' claims against Universal fell within the cited exclusions.

### DISCUSSION

We review a summary judgment de novo. (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) We decide independently whether, viewing the evidence in the light most favorable to the nonmoving party, "the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Ibid.*; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

The dispute over whether the assigned causes of action are time barred as a result of section 23301 raises a question of statutory interpretation we review de novo. (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) To do so, we look first to the statute's words. (*Ibid.*) "If the statutory language is clear and unambiguous, our task is at an end." (*Id.* at p. 1083.) If not, we may consider maxims of construction and extrinsic aids, like the statute's purpose. (*Ibid.*)

We also review de novo "the interpretation of the provisions of a policy of insurance," applying "settled rules governing the interpretation of insurance contracts." (*Powerine Oil Co. v. Superior Court* (2005) 37 Cal.4th 377, 390.) " ' "Our goal in construing insurance contracts, as with contracts

7

generally, is to give effect to the parties' mutual intentions." ' [Citation.]
' "Such intent is to be inferred, if possible, solely from the written provisions
of the contract." ' " (*Inns-by-the-Sea v. California Mutual Ins. Co.* (2021)
71 Cal.App.5th 688, 697.) We give those provisions their " ' "ordinary and
popular sense" ' " and do not "strain to create an ambiguity where none
exists." (*Waller v. Truck Ins. Exch., Inc.* (1995) 11 Cal.4th 1, 18–19 (*Waller*).)
But if ambiguity does exist, we construe it "against the insurer, as drafter of
the policy." (*Duarte v. Pacific Specialty Ins. Co.* (2017) 13 Cal.App.5th 45, 54.
.)[2]

## I.

### *Section 23301 Bars the Assigned Causes of Action*

The "corporate powers, rights and privileges" of a corporation may be
suspended if it fails to pay any tax due to the Franchise Tax Board.
(§ 23301.) Consequently, while a corporation is suspended for failure to pay
taxes, it may not prosecute or defend an action. (*Cal-Western Business
Services, Inc. v. Corning Capital Group* (2013) 221 Cal.App.4th 304, 310
(*Cal-Western*).) "The purpose of . . . section 23301 'is to "prohibit the
delinquent corporation from enjoying the ordinary privileges of a going
concern" [citation], and to pressure it to pay its taxes.' " (*Ibid.*)

A suspended corporation's incapacity to sue applies to its assignee, who
" ' " 'stands in the shoes' of the assignor, taking his rights and remedies[]

---

[2] Plaintiffs note another basic rule of policy interpretation: "Whereas
coverage clauses are interpreted broadly so as to afford the greatest possible
protection to the insured [citations], exclusionary clauses are interpreted
narrowly against the insurer." (*State Farm Mutual Auto. Ins. Co. v.
Partridge* (1973) 10 Cal.3d 94, 101–102 (*Partridge*).) But as plaintiffs
acknowledge, there is no dispute that their claims against Universal were
within the insuring clauses of the relevant policies, so only the rule that
exclusions are construed narrowly, which we apply, is relevant here.

subject to any defenses which the *obligor* has against the assignor prior to notice of the assignment." ' " (*Cal-Western*, *supra*, 221 Cal.App.4th at p. 311; accord, *Welco Construction, Inc. v. Modulux, Inc.* (1975) 47 Cal.App.3d 69, 70–72; *Cleveland v. Gore Bros., Inc.* (1936) 14 Cal.App.2d 681, 682–683.) As noted in *Cal-Western*, the latter rule governing assignments is codified: "In the case of an assignment of a thing in action, the action by the assignee is without prejudice to any . . . defense existing at the time of, or before, notice of the assignment." (Code Civ. Proc., § 368, quoted in *Cal-Western*, at p. 311.)

In *Cal-Western*, as here, the corporate assignor remained suspended throughout the assignee's action with no prospect of revival, barring the action. (*Cal-Western*, *supra*, 221 Cal.App.4th at pp. 309, 312–314.) In other cases, assignees filed suit within the limitations period, the periods expired while the assignors' corporate powers remained suspended, and the powers were then revived. (*V & P Trading Co., Inc. v. United Charter, LLC* (2012) 212 Cal.App.4th 126, 135–136; *Welco Construction, Inc. v. Modulux, Inc.*, *supra*, 47 Cal.App.3d at pp. 70–72.) The revivals did not retroactively validate the filing of the actions so as to avoid the expired limitations period. (*V & P Trading*, at p. 132; *Welco Construction, Inc.*, at p. 72.) In *Casiopea Bovet LLC v. Chiang* (2017) 12 Cal.App.5th 656 (*Casiopea*), the court applied the rule to a judgment creditor of a suspended corporation assigned a claim belonging to the corporation by court order rather than by contract. (*Id.* at p. 662.)

Plaintiffs contend that applying section 23301 to them would not further the statute's purpose, and their claims fall within an equitable exception. They assert that "public policy permit[s] persons who have dealt with, or have been damaged by a suspended corporation to pursue litigation (via assignment) advancing their interests even if that litigation is collaterally

relevant to the suspended corporation." But no case they cite involved an assignment subject to Code of Civil Procedure section 368 and the venerable rule of equity that it codified. (See *McCabe v. Grey* (1862) 20 Cal. 509, 515 [substantively identical predecessor statute "merely adopts the rule which has always prevailed in equity"].)

Instead, to support their claim that public policy permits those damaged by a suspended corporation to pursue litigation advancing their interests, plaintiffs cite *Wanke, Industrial, Commercial, Residential, Inc. v. AV Builder Corp.* (2020) 45 Cal.App.5th 466 (*Wanke*), in which a judgment creditor of a suspended corporation filed a "creditor's suit" pursuant to Code of Civil Procedure section 708.210 against a company that owed the suspended corporation money. (*Wanke*, at pp. 473–474.) The Fourth District rejected the company's contention, based on "assignment cases," that the suspended corporation's incapacity to sue should bar its judgment creditor from pursuing a creditor's suit against the company. (*Id.* at pp. 474–477.) The court relied on the difference between the creditor's suit statute and Code of Civil Procedure section 368, which governs assignments: "the creditor's suit statute considers solely whether the judgment debtor [i.e., the suspended corporation] has an 'interest' in property held by the third person or is owed a debt by the third person. There is no requirement for the judgment debtor to have present *capacity* to collect against the third person. And because no assignment is created, section 368 is not triggered and any incapacity by the judgment debtor does not present a bar to the judgment creditor's recovery." (*Wanke*, at p. 477.)

In *Casiopea*, *supra*, 12 Cal.App.5th 656, one of the "assignment cases" mentioned in *Wanke*, *supra*, 45 Cal.App.5th at page 474, the court held that "An equitable exception is not available to [the assignee] to prevent

10

application of . . . section 23301." (*Casiopea*, at p. 663.)  The court then distinguished most of the cases plaintiffs cite.  (See *id.* at pp. 663–664.)  In each, the court noted, the plaintiff relied not on an assigned cause of action but "an independent right or harm."  (*Ibid.*, citing *Performance Plastering v. Richmond American Homes of California, Inc.* (2007) 153 Cal.App.4th 659, 668–669 [plaintiff was third party beneficiary of suspended corporation's contract with defendant]; *Biggs v. California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 645 [plaintiff was agency exercising statutory powers]; *Reed v. Norman* (1957) 48 Cal.2d 338, 343 [plaintiffs were stockholders pursuing derivative action]; *Bozzio v. EMI Group Ltd.* (9th Cir. 2016) 811 F.3d 1144, 1150 [plaintiff was third party beneficiary].)  Here, while plaintiffs have direct claims against the insurers for Universal's policy limits (Ins. Code, § 11580), their distinct causes of action to recover the full amount of the default judgments rest solely on a contractual assignment, not any independent right or harm.

Plaintiffs also cite cases involving sureties and insurers of suspended corporations.  (*Kalfountzos v. Hartford Fire Ins. Co.* (1995) 37 Cal.App.4th 1655, disapproved on other ground in *William R. Clarke Corp. v. Safeco Ins. Co.* (1997) 15 Cal.4th 882, 896; *Travelers Property Casualty Co. of America v. Liberty Surplus Ins. Corp.* (9th Cir. 2020) 806 Fed.Appx. 526.)  The decisions hold that a surety, sued on its bond, can assert the defenses of its suspended corporate principal (*Kalfountzos*, at pp. 1656–1657), and that an insurer can intervene in a suit against its suspended insured to assert its defenses (*Travelers Property Casualty Co. of America*, at pp. 528–529).  Neither case involved an assignment subject to Code of Civil Procedure section 368, and in each the surety or insurer was a party in its own right.

11

These cases thus provide no support to plaintiffs, whose action to recover the full amounts of the default judgments relies on assigned claims.

Beyond lacking support in precedent, plaintiffs' equity and public policy arguments fail on their own terms. Their policy-based argument is as follows: The purpose of section 23301 is to pressure suspended corporations to pay their taxes; the statutory disability extends to the corporation's assignees because otherwise the corporation could evade the statute by simply assigning (i.e., selling) their causes of action; but here, plaintiffs are not insiders or affiliates helping Universal evade the statute, but injured parties vindicating their own rights to be made whole. In thus invoking the policy behind the statute, plaintiffs attempt to skip the first step of statutory construction—construing a statute's text—and leap to the second, at which we may consider such extrinsic aids as a statute's purpose. (*MacIsaac v. Waste Management Collection & Recycling, Inc.*, *supra*, 134 Cal.App.4th at p. 1083.) But a statute's text " ' "generally is the most reliable indicator of legislative intent." ' " (*Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198.) Only if that text is ambiguous do we consider a statute's purpose. (*Ibid.*) And if so, we consider the statute's purpose to illuminate its language; we cannot simply substitute one for the other. (*Weiss v. City of Del Mar* (2019) 39 Cal.App.5th 609, 624.)

In *Weiss v. City of Del Mar*, *supra*, 39 Cal.App.5th 609, the appellant claimed that a statute imposing a short limitations period on challenges to actions by certain agencies, which had the stated purpose of avoiding delays of housing projects, did not apply to her challenge to a view ordinance because there was "no urgency to resolving the view dispute." (*Id.* at p. 624.) The Fourth District rejected her claim in terms applicable here: "the statutory language does not support that the particular urgency in each case

12

must be analyzed before the statute is triggered.  Although the importance of moving forward on new projects or developments was a central purpose of the statute, the statute does not say that a court must consider the need for an immediate determination each time it applies the statute." (*Ibid.*)

Here, a central purpose of section 23301 is to pressure a suspended corporation to pay its taxes by denying it the benefits of the court system until it does so, while Code of Civil Procedure section 368 prevents parties from circumventing such legal disabilities by assignment.  (*Cal-Western*, *supra*, 221 Cal.App.4th at pp. 310, 314.)  But the statutes do not say a court must consider the need to pressure a specific corporation to pay its taxes, or assess whether a specific assignee seeks to help its assignor circumvent a legal disability, each time the court applies the statutes' plain language.  Plaintiffs cannot convert a statement of section 23301's purpose into a case-by-case test of its applicability.  (*Weiss v. City of Del Mar*, *supra*, 39 Cal.App.5th at p. 624.)

Plaintiffs also assert that "equity must favor the Perez Family, which seeks redress *for their own benefit* by enforcing the suspended corporation's rights against others."  But an equitable exception to section 23301 need not be implied here, as plaintiffs suffered no harm from the alleged wrongful conduct of the insurers.  The default judgments establish Universal's liability to plaintiffs in the total sum of $41 million for causing or contributing to Perez's death from mesothelioma.  The law affords plaintiffs a *direct* cause of action against the insurers to recover the damages owed to them by the insolvent Universal for that harm—up to the $6 million limit of the insurance policies Universal purchased from the insurers.  (Ins. Code, § 11580, subd. (b).)  The alleged wrong underlying the *assigned* causes of action is the insurers' breach of a duty owed not to plaintiffs but to Universal.  (*Murphy v.*

13

*Allstate Ins. Co.* (1976) 17 Cal.3d 937, 941 ["insurer's duty to settle" runs "to the insured and not to the injured claimant"].)  Had the insurers defended the underlying actions and settled within the policy limits, plaintiffs would have no factual or legal basis to seek recovery of the roughly $35 million by which the default judgments exceed the limits of Universal's policies from the insurers.  Plaintiffs' inability to recover that sum is due to Universal's decisions about how much insurance to buy in the 1980s and its subsequent descent into insolvency—not the insurers' breach of any duty they owed to plaintiffs.

## II.

### *The Policy Exclusions Bar Plaintiffs' Direct Claims*

The trial court granted summary judgment on the ground that the product and vehicle exclusions collectively bar plaintiffs' direct claims.  The insurers offer two arguments in defense of the judgment.  First, they argue the product exclusions alone bar the claims.  They do so, the insurers argue, because the only theory of exposure pled in the personal injury complaint concerned Perez's work with brakes that had entered Transport's possession, at which point they satisfied the policies' definitions of "products."  (See p. 3, *ante*.)  The default judgments thus preclude a claim of exposure through Universal's van.  Second, even if Perez was exposed to asbestos by opening and entering the van to unload the brakes—i.e., before they entered Transport's possession—the product and vehicle exclusions would still bar plaintiffs' claims.  As set forth below, we disagree with the first argument but agree with the second.

### A.  The Default Judgments Have No Preclusive Effect on Coverage

The insurers' unsuccessful initial argument is as follows:  The default judgments rest solely on a theory that Perez was exposed to asbestos from Universal's brakes during his "inspection, adjustment, maintenance, repair,

14

installation and replacement" of brakes on chassis, as pled in paragraph IX of the personal injury complaint. A default has the effect of "admitting the well-pleaded allegations of the complaint" as to liability, and the "only evidentiary facts that have a place at a prove-up hearing are those concerning . . . damages . . . ." (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 899–900 (*Carlsen*).) Thus, the insurers argue, the trial court should not have admitted Darwin's testimony about Perez opening the doors of and entering Universal's delivery van at the prove-up hearing. The personal injury complaint alleged exposure only through work with brakes that were in Transport's possession and thus constituted "products," and the wrongful death judgment rests solely on the preclusive effect of the personal-injury judgment, so the product exclusions apply to both.

The insurers' argument is founded on an unduly narrow reading of the personal injury complaint. While paragraph IX did describe exposure based on work with the brakes at times when they satisfied the definitions of "products," paragraph X was not so limited. Paragraph X alleged that, in "the course and scope of his attendance and work, [Perez] was exposed to asbestos products and asbestos-related materials of defendants, which . . . proximately caused him to develop . . . mesothelioma." That allegation easily encompasses a claim that Perez was exposed to asbestos from Universal's brakes by opening and entering its delivery van to unload them. The insurers' brief offers no argument as to why the default judgments cannot be read to encompass the van exposure theory through paragraph X of the personal injury complaint; it simply ignores that paragraph.[3]

---

[3] Asked about paragraph X at oral argument, the insurers' counsel contended that its scope must be read as implicitly limited by the specific theories of exposure set forth in paragraph IX. But the insurers cite no authority requiring us to read the complaint in such a narrow manner.

In focusing on the facts alleged in paragraph IX and ignoring the facts alleged in paragraph X, the insurers fall prey to a "cause of confusion" noted in *Carlsen*: "the use of the term 'facts' to refer both to material facts and to evidentiary facts." (*Carlsen*, *supra*, 227 Cal.App.4th at p. 884, fn. 6.) *Carlsen*'s analysis of evidence admissible in a prove-up hearing turns on the difference between " 'an ultimate fact, [which is] an element of a cause of action, and an evidentiary fact which supports the existence of the element." (*Id*. at p. 888.) When a defaulting defendant "admit[s] the well-pleaded allegations of the complaint," that means its allegations of *ultimate* fact: "A well-pleaded complaint 'set[s] forth the ultimate facts constituting the cause of action, not the evidence by which plaintiff proposes to prove those facts.' " (*Id*. at p. 898.) A default's admission of the ultimate facts establishing liability makes it unnecessary to "tender evidentiary facts supporting [those] allegations . . . ." (*Ibid*.) Universal's default thus made both the allegations of evidentiary fact in paragraph IX and Darwin's testimony about the van immaterial.

It is " 'well-settled' that 'an insurer who is on notice of an action against its insured and refuses to defend on the ground the alleged claim is not within the policy coverage is bound by a judgment in the action . . . "as to all material findings of fact essential to the judgment of liability [and damages] of the insured." ' " (*Executive Risk Indemnity, Inc. v. Jones* (2009) 171 Cal.App.4th 319, 330.)[4] The only material findings essential to the

---

[4] According to our colleagues in Division Four, "courts have generally examined the right of insurers to reopen and relitigate the liability of their insureds for covered losses and resulting damages, [as] established by third-party judgments, without resorting to principles of privity or [issue preclusion]. Instead, the cases employ a distinct preclusion doctrine . . . more akin to the well-settled principles of contractual indemnity." (*Executive Risk*

16

default judgments against Universal were that Perez was exposed to its asbestos-containing products, and such exposure proximately caused him to develop mesothelioma, as alleged in paragraph X. Any arguable finding of evidentiary fact as to *how* Perez was exposed to asbestos from those products was not material or essential to the judgments. (*Carlsen*, *supra*, 227 Cal.App.4th at pp. 899–900.)

Precisely *how* Perez was exposed to asbestos from Universal's products matters only to the issue of insurance coverage, which was not litigated in the underlying actions. An insurer is *not* bound "as to issues not necessarily adjudicated in the prior action" and may "present any defenses not inconsistent with the judgment against the insured." (*Geddes & Smith, Inc. v. St. Paul-Mercury Indem. Co.* (1959) 51 Cal.2d 558, 561–562.) "Generally speaking, in an action by an injured party against the party who allegedly caused the injury the court does not adjudicate the issue of insurance coverage. The only questions litigated are the defendant's liability and the amount of damages. The plaintiff is not concerned with the theory of liability which produces victory; only with procuring the largest possible judgment. . . . [Citation.] Whether the plaintiff's loss is covered by the defendant's insurance is not germane to the action." (*Schaefer/Karpf*

---

*Indemnity, Inc. v. Jones, supra*, 171 Cal.App.4th at p. 329.) It makes no difference here whether we apply that "distinct preclusion doctrine" or standard rules of issue preclusion. (See *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 825 ["issue preclusion applies: (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party"].) The key under either version of preclusion doctrine is that, as a result of Universal's defaults, the exact manner in which Perez was exposed to asbestos from its brakes was not necessarily decided in, and could not be the subject of a material finding essential to the judgment in, the underlying actions.

*Productions v. CNA Ins. Companies* (1998) 64 Cal.App.4th 1306, 1313.) Here, because the underlying actions were resolved by default, that explanation applies a fortiori.

In sum, the default judgments do not include any material finding of fact entitled to preclusive effect, either that Perez *was* exposed to asbestos by opening and entering Universal's van, or that he was *not* exposed in that way.

## B. The Product and Vehicle Exclusions Collectively Apply

The insurers contend two pairs of policy exclusions—the product and vehicle exclusions—eliminate any possibility of coverage for plaintiffs' claims against Universal, regardless of the way or ways in which Perez was exposed to asbestos from its brakes. Although we must construe policy exclusions narrowly (*Waller*, *supra*, 11 Cal.4th at p. 16), we agree.[5]

The product exclusions apply to products Universal had "turned over to others," or of which it had relinquished "physical possession." (See p. 3, *ante*.) While plaintiffs do not dispute that those exclusions apply to Perez's exposure from work with Universal's brakes, plaintiffs argue they do not apply to his exposure when he opened the doors of and entered Universal's delivery van. At that point, they contend, Universal had not yet relinquished possession of the brakes. The insurers contend that, because Universal had "delivered" the brakes and Perez was unloading them, it had "stopped holding them

---

[5] Plaintiffs claim the insurers waived the right to raise exclusions other than that for products by not citing them in their letters denying coverage. But "a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial." (*Waller*, *supra*, 11 Cal.4th at p. 31.) Plaintiffs cite only a series of letters raising the products exclusion while warning, "we do not intend to limit in any way our right to rely on any of the policies' other . . . exclusions." The claim that such letters implicitly waived the right to rely on other exclusions borders on frivolous.

physically" and "given over possession." The insurers do not cite pertinent authority, quote a policy definition of "possession," or explain how the brakes ceased to be in Universal's possession simply because Perez opened its van or stepped inside. We agree with plaintiffs that the brakes remained in Universal's possession as they lay untouched in the back of its van. (See *General Casualty Co. of America v. Azteca Films, Inc.* (9th Cir. 1960) 278 F.2d 161, 168 [applying California law; layperson would construe "possession" as used in products exclusion to mean actual possession].)

The insurers are correct, however, that the vehicle exclusions apply to any exposure occurring by way of Universal's van. As noted, those exclusions apply to harm arising from the "use, maintenance, repair, or loading or unloading" of a vehicle, or from "a condition in or on a vehicle created by the loading or unloading thereof." (*Ante*, at p. 3.)

To contend those exclusions do not apply, plaintiffs rely on Darwin's testimony to construct a theory of exposure with multiple, concurrent causes.[6] They contend Universal negligently packed its brakes "pad to pad" in the van; the van's vibration in transit made the pads rub together, releasing asbestos fibers; and Perez was exposed to the fibers when the wind blew them out as he opened the van's doors to unload it, and when he entered the van for the same reason. Plaintiffs concede the driving of the van falls within the exclusion.

---

[6] While Darwin's testimony did not lead to any factual finding in the underlying actions entitled to preclusive effect here (see pp. 15–18, *ante*), the transcript of his testimony constitutes evidence indicating plaintiffs might be able to prove that Perez was exposed to asbestos by opening and entering Universal's van. As the insurers implicitly recognize, they can thus be entitled to summary judgment only if they establish that they are entitled to judgment as a matter of law even assuming Perez *was* exposed to respirable asbestos fibers in that manner. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851.)

19

But they argue that, under *Partridge*, *supra*, 10 Cal.3d 94, Universal's negligent packing of its brakes and its "failure to prevent the escape of asbestos fibers when its vans were opened" each was an independent, concurrent cause of exposure. Such a cause triggers coverage even if another concurrent proximate cause—here, the driving of the van—is excluded. (*Id.* at p. 102.) As set forth below, however, the rule of *Partridge* does not apply to plaintiffs' claims.

In *Partridge*, *supra*, 10 Cal.3d 94, a "hunting enthusiast . . . filed the trigger mechanism of his pistol . . . so that the gun would have 'hair trigger action,' " a negligent act that made the gun highly dangerous. (*Id.* at p. 97.) One day, he went driving with two friends to hunt rabbits by firing the gun out the window. (*Id.* at p. 98.) Pursuing a rabbit, he drove onto rough terrain while holding the gun either in his lap or on the steering wheel. (*Ibid.*) He hit a bump, the gun discharged, and one of his friends was paralyzed. (*Ibid.*)

Partridge claimed coverage under a policy with an exclusion, effectively identical to those here, for injury "arising out of the ownership, maintenance, operation, use, loading or unloading" of a vehicle. (*Partridge*, *supra*, 10 Cal.3d at p. 99 & fn. 6, capitalization omitted.) While his use of a car was a proximate cause of the accident, it "was not the sole cause," but "one of two joint causes." (*Id.* at p. 102.) The parties agreed the policy covered harm due to the negligent act of filing the trigger and would apply "if the gun had accidentally fired while the insured was . . . running through the woods." (*Id.* at p. 103.) But the insurer argued that, because the accident arose out of his use of a car, the exclusion applied. (*Ibid.*) Disagreeing, our Supreme Court held that, if an accident is "caused jointly by an insured risk (the negligent filing of the trigger mechanism) and by an excluded risk (the negligent

20

driving) . . . , the insurer is liable so long as one of the causes is covered." (*Id.* at p. 102.)

Plaintiffs claim Universal's negligent packing of its brakes and failure to prevent the escape of asbestos when its van doors were opened are each "analogous to Partridge's creation of hair-trigger action on his pistol." But a line of decisions following *Partridge* establishes that neither such act or omission was sufficiently independent of Universal's "use . . . or loading or unloading" of the van—or sufficiently independent of a condition in the van "created by the loading or unloading thereof"—to avoid the vehicle exclusions.

In *State Farm Fire & Casualty Co. v. Camara* (1976) 63 Cal.App.3d 48 (*Camara*), the insured "started with a 1970 Volkswagen and 'designed, constructed and assembled' it into a dune buggy" that he later crashed, injuring a passenger. (*Id.* at p. 53.) The passenger contended that the act of modifying the vehicle was independent of and prior to its " 'use,' " but the court held the automobile use exclusion applied. (*Id.* at p. 54.) The result would be the same, it added, "even if we conceived of the work on the dune buggy as not involving its ownership, maintenance, etc." (*Ibid.*) To trigger the rule of *Partridge*, "the nonvehicle-related cause must be independent of the vehicle-related cause . . . ." (*Ibid.*) The negligent act of designing the dune buggy did not qualify: "Although the operation or use of the dune buggy was not the sole cause of the accident, any contributing *design* cause was dependent upon such operation or use, such that any liability for negligent design necessarily arose out of the operation or use of the motor vehicle. [¶] In other words, the *only* way in which plaintiff could have been exposed to the claimed design risk was through the operation or use of the motor vehicle." (*Id.* at p. 55.)

Each of *Camara*'s rationales applies here. The negligent packing of the brakes "pad to pad" in the van was not independent of the van's "use . . . loading or unloading"; to the contrary, the asserted negligence lay in how Universal packed the brakes when it loaded the van. But even if the packing were deemed distinct from the van's loading, and to be a cause of Perez's injuries, "the *only* way in which [Perez] could have been exposed to the claimed [packing] risk was through the operation or use of the motor vehicle." (*Camara*, *supra*, 63 Cal.App.3d at p. 55.) It was the van's vibration *while being driven* that allegedly caused the negligently packed brakes to rub together and release asbestos, and Perez's opening of its doors and entry into the van *to unload it* that exposed him to the fibers. "Although the operation or use of the [van] was not the sole cause of the accident, any contributing [packing] cause was dependent upon such operation or use." (*Ibid.*)

Many courts have followed *Camara* to hold that nonvehicle-related negligence was not sufficiently independent of a vehicle's use to avoid an exclusion. (See, e.g., *Farmers Ins. Exchange v. Superior Court* (2013) 220 Cal.App.4th 1199, 1211 [negligent failure to supervise child who ran to greet relative driving up driveway]; *Providence Washington Ins. Co. v. Valley Forge Ins. Co.* (1996) 42 Cal.App.4th 1194, 1203 [negligent tire repair]; *Gurrola v. Great Southwest Ins. Co.* (1993) 17 Cal.App.4th 65, 67–68 [negligent welding of rebuilt car]; *National American Ins. Co. v. Coburn* (1989) 209 Cal.App.3d 914, 918–920 [negligent failure to supervise children in parked van while loading van]; *Safeco Ins. Co. v. Gilstrap* (1983) 141 Cal.App.3d 524, 527 [negligent entrustment of vehicle]; *Allstate Ins. Co. v. Jones* (1983) 139 Cal.App.3d 271, 277 [negligent securing of rebar] (*Jones*).)

Most closely analogous is *Jones*, *supra*, 139 Cal.App.3d 271, in which a contractor negligently secured steel rods (rebar) to a pickup truck, on a rack

22

designed for such storage.  (*Id.* at p. 273.)  In an accident, a piece of rebar flew off and killed a man.  (*Ibid.*)  The Fourth District relied on *Camara* to hold that the negligence in securing the rebar was not sufficiently independent of the truck's use to come under *Partridge* and avoid a vehicle use exclusion.  (*Jones*, at pp. 277–278.)  The insured's failure to inspect the securing of the rebar would not have caused harm "were it not for his use of the truck." (*Ibid.*)

To avoid a vehicle-use exclusion, in sum, the insured's liability must "arise from their nonauto-related conduct *and* exist independently of any use of their vehicle."  (*National American Ins. Co. v. Coburn*, *supra*, 209 Cal.App.3d at p. 918, citing *Partridge*, *supra*, 10 Cal.3d at p. 103.)  It is not enough to identify an act that is in some sense independent of a vehicle's use; the act must be capable of causing harm absent any use of the vehicle.  The negligent gun alteration in *Partridge* qualified, for the gun could have accidentally discharged in many scenarios not involving a vehicle. (*Partridge*, at p. 103.)  Such acts as negligently securing rebar or negligently modifying a vehicle did not qualify, for they could cause harm only through use of the vehicle.  (*Jones*, *supra*, 139 Cal.App.3d at p. 277; *Camara*, *supra*, 63 Cal.App.3d at p. 55.)  Here, too, the negligent loading of brakes into Universal's van could not have caused harm except through the van's subsequent use and unloading.

Nor was Universal's "failure to prevent the escape of asbestos fibers when its vans were opened" independent of their use or unloading.  Plaintiffs cite a case in which a man parked a pickup truck and left his dogs in the back under a camper shell, unaware the shell's windows were ajar.  (*State Farm Mutual Automobile Ins. Co. v. Grisham* (2004) 122 Cal.App.4th 563, 565.)  Some 30 to 120 minutes later, the dogs leapt out a window and bit a man 20

23

to 25 yards away from the truck.  (*Ibid.*)  The Third District held the injury did not arise from "use" of the truck.  (*Id.* at pp. 567–568.)  Its use to bring the dogs to the area of the attack did not suffice:  "the use of the vehicle must contribute in some way to the injury beyond merely serving as the situs of the injury" or merely transporting a tortfeasor to the place where they later commit a tort.  (*Id.* at pp. 567–568.)  "Something involving the vehicle's operation, movement, or maintenance, or its loading or unloading must be a contributing cause."  (*Id.* at p. 567.)

Here, it was Perez's act of opening the van's doors to unload it that released asbestos fibers.  The decision on which plaintiffs rely discussed "a situation in which something falls out of a vehicle and causes injury."  (*State Farm Mutual Automobile Ins. Co. v. Grisham*, *supra*, 122 Cal.App.4th at p. 570.)  Such an event would "most likely" arise from the vehicle's use, the court noted, "if the item falls out while the vehicle is being operated, moved, maintained, loaded or unloaded."  (*Ibid.*)  That is precisely what plaintiffs claim happened here.

## DISPOSITION

The summary judgment is affirmed.  The insurers are entitled to their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

24

_____
Mayfield, J.*

We concur:


_____
Stewart, P. J.


_____
Miller, J.

*Perez et al. v. Century Indemnity Company et al.* (A167536)


* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.