[No. C052768. Third Dist. July 24, 2007.]

PERFORMANCE PLASTERING et al., Plaintiffs and Appellants, v. RICHMOND AMERICAN HOMES OF CALIFORNIA, INC., et al., Defendants and Respondents.

RICHMOND AMERICAN HOMES OF CALIFORNIA, INC., et al., Plaintiffs and Respondents, v. PERFORMANCE PLASTERING et al., Defendants and Appellants.

660

**COUNSEL**

Farmer, Murphy, Smith & Alliston, Murphy, Campbell, Guthrie & Alliston, George E. Murphy, Suzanne M. Nicholson; Mackenroth & Laird and Ralph E. Laird for Plaintiffs and Appellants and for Defendants and Appellants.

Payne & Fears, Scott S. Thomas, J. Kelby Van Patten and Sean T. Nguyen for Defendants and Respondents and for Plaintiffs and Respondents.

**OPINION**

**ROBIE, J.**—In this case we deal with the falling out between a homebuilder, Richmond American Homes of California, Inc., one of its subcontractors, Performance Plastering,[1] and the subcontractor's insurer, CalFarm Insurance Company.

---

[1] Although Performance Plastering is listed as a plaintiff on the notice of appeal, it makes no appearance on appeal. We therefore resolve the issues in this case only as they relate to CalFarm.

The problems underlying this case began when Performance Plastering was suspended as a corporation and Richmond began receiving complaints of defective construction work done by Performance Plastering on some of Richmond's homes. In an attempt to resolve liability, Richmond and Performance Plastering entered into the so-called *El Niño* settlement agreements, and Richmond and CalFarm entered into the so-called *Air Design* settlement agreement. The *El Niño* settlement agreements released Performance Plastering and its insurers from claims related to 65 homes in Elk Grove in exchange for Performance Plastering paying Richmond $57,000. The *Air Design* settlement agreement dismissed Performance Plastering from all claims, gave Performance Plastering a release of all claims identified on a "subcontractor allocation," and obligated Richmond to give five business days' notice to CalFarm "of any potential indemnity claims," all in exchange for CalFarm's paying Richmond $8,700.

A few years later, CalFarm and Performance Plastering sued Richmond for breach of contract and declaratory relief based on Richmond's alleged violation of the *El Niño* and *Air Design* settlement agreements.

Richmond demurred to the first amended complaint. The trial court sustained the demurrer without leave to amend, ruling that neither plaintiff could pursue the lawsuit because Performance Plastering is a suspended corporation and CalFarm had no standing to bring claims based on agreements to which it was neither a party nor a third party beneficiary. The court also granted Richmond's request for attorney fees based on a prevailing party theory.

On appeal, we reverse the judgment sustaining the demurrer without leave to amend because CalFarm had standing to bring the lawsuit as it was a party to the *Air Design* settlement agreement and was a third party beneficiary of the *El Niño* settlement agreements. Accordingly, we also reverse the award of attorney fees to Richmond.

## FACTUAL AND PROCEDURAL BACKGROUND

Performance Plastering subcontracted with Richmond in June 1994 to perform stucco work on homes being built by Richmond in Sacramento County. The subcontract agreement contained a prevailing party attorney fee clause that stated, "if contractor initiates legal action and prevails against

subcontractor under this Agreement, subcontractor shall pay all litigation costs incurred by contractor in prosecuting that action." The subcontract agreement also contained a modification clause that stated, "[t]his Agreement . . . can only be modified by written amendment executed by authorized agents of the parties hereto."

Following the El Niño rains in 1997, Richmond asserted construction defect claims against Performance Plastering for work Performance Plastering had done on some of Richmond's homes in Elk Grove.

In November 1998, the Secretary of State suspended Performance Plastering as a corporation. Subsequently, the Franchise Tax Board also suspended Performance Plastering because it failed to pay taxes.

In June 2001, Richmond and Performance Plastering entered into the *El Niño* settlement agreements. According to the terms of the two settlement agreements, Performance Plastering would pay Richmond a total of $57,000 and, in exchange, Richmond would "release[] and forever discharge[] Subcontractor and its insurers . . . from any and all past, present or future claims, demands, obligations or causes of action . . . which Richmond has or which may later accrue to Richmond with respect to the Claim." There was one claim attached to each settlement agreement: the first one listed 26 homes in the Rosegarden subdivision in Elk Grove, and the second one listed 39 homes in the Legacy Park subdivision in Elk Grove.

Richmond sued Performance Plastering for more alleged construction defects. In March 2003, that lawsuit settled orally at a settlement conference under what became known as the *Air Design* settlement agreement. Present at the settlement conference were attorneys for Richmond and CalFarm along with Richmond and CalFarm "representative[s]." CalFarm agreed to pay Richmond $8,700 and, in return, Richmond agreed to "dismiss[] . . . Performance of all claims," release all claims "as to the properties identified on [the subcontractor] allocation," "reserv[e] its right to indemnity" for "any claim" not identified on the subcontractor allocation, and give CalFarm "five business days' notice" "of any potential indemnity claims" and if it did not "the indemnity claim is lost."

In April 2003, Richmond was sued for construction defects arising from Performance Plastering's work in a lawsuit that became know as the *Tasker* case. Richmond filed a cross-complaint against Performance Plastering (case

No. 04AS03269). Performance Plastering answered the cross-complaint and alleged that the claims were barred because Richmond failed to give five business days' notice, in violation of the *Air Design* settlement agreement and because the *Tasker* cross-complaint involved liability regarding homes covered in the *El Niño* settlement agreements.

In June 2005, Richmond, CalFarm, and Performance Plastering "by and through" CalFarm, entered into a settlement contribution agreement in the *Tasker* case. CalFarm agreed to pay $18,000 to Richmond in exchange for Richmond's agreement to release Performance Plastering from all claims for damages that arise out of the *Tasker* case. The agreement also reserved the parties' right to seek judicial determination of the applicability and enforceability of the *El Niño* and *Air Design* settlement agreements to the *Tasker* case.

Thereafter, CalFarm and Performance Plastering "by and through" CalFarm sued Richmond for breach of contract and declaratory relief based on Richmond's alleged violation of the *El Niño* and *Air Design* settlement agreements (case No. 05AS01309). According to the allegations in the first amended complaint, Richmond violated the *El Niño* settlement agreements by suing Performance Plastering in the *Tasker* case for claims involving homes that were part of the *El Niño* settlement agreements. Richmond also violated the *Air Design* settlement agreement by failing to give CalFarm five business days' notice of the claims made in the *Tasker* case.

Richmond demurred to the first amended complaint. The court sustained the demurrer without leave to amend and entered a judgment of dismissal. The court reasoned that neither plaintiff could pursue the lawsuit because Performance Plastering is a suspended corporation and CalFarm had no standing to bring claims based on agreements to which it was neither a party nor a third party beneficiary.

Thereafter, Richmond moved to recover attorney fees for defending case No. 05AS01309 based on the prevailing party attorney fee clause in the subcontract agreement. The trial court granted the request.

Performance Plastering and CalFarm filed a timely notice of appeal from the judgment of dismissal and the order granting Richmond's request for attorney fees.

On appeal, CalFarm argues that the trial court erred in sustaining the demurrer without leave to amend because it had standing to bring the lawsuit on its own behalf. CalFarm further argues that the trial court erred in awarding attorney fees to Richmond.

## DISCUSSION

### I

### *Standard of Review*

"A demurrer tests the legal sufficiency of the complaint." (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497 [57 Cal.Rptr.2d 406].) On review of an order sustaining a demurrer without leave to amend, our initial standard of review is de novo, "i.e., we exercise our independent judgment about whether the complaint states a cause of action as a matter of law." (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790 [90 Cal.Rptr.2d 598].) In analyzing the complaint, we "give[] the complaint a reasonable interpretation, and treat[] the demurrer as admitting all material facts properly pleaded." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) We also consider matters shown in exhibits attached to the complaint and incorporated by reference. (*Frantz v. Blackwell* (1987) 189 Cal.App.3d 91, 94 [234 Cal.Rptr. 178].) "[T]o the extent the factual allegations conflict with the content of the exhibits to the complaint, we rely on and accept as true the contents of the exhibits." (*Barnett v. Fireman's Fund Ins. Co.* (2001) 90 Cal.App.4th 500, 505 [108 Cal.Rptr.2d 657].) "[I]t is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment." (*Aubry*, at p. 967.)

### II

### *The Trial Court Abused Its Discretion in Sustaining the Demurrer Without Leave to Amend as to Counts Two and Four Relating to the* El Niño *Settlement Agreements*

CalFarm contends the trial court erred in sustaining the demurrer without leave to amend because it was a party to or third party beneficiary of the *El Niño* settlement agreements.

As will be shown, although CalFarm was not a party to the *El Niño* settlement agreements, it was a third party beneficiary of those agreements.

Accordingly, it had standing to sue on its own behalf in the present action, and the trial court abused its discretion in sustaining the demurrer without leave to amend.

## A

### *CalFarm Was Not a Party to the* El Niño *Settlement Agreements*

According to the first amended complaint, "Richmond on the one hand and Performance Plastering and CalFarm on the other hand" entered into the *El Niño* settlement agreements. "[I]n exchange for valuable and adequate consideration paid by CalFarm on behalf of Performance Plastering, Richmond released and forever discharged Performance Plastering and CalFarm from any further liability with respect to homes involved in the *El Niño* Claims." CalFarm contends that "[t]hese allegations clearly establish CalFarm as a party to the *El Niño* settlement agreements," and "[t]he trial court was bound to accept these allegations as true."

Contrary to CalFarm's contention, the trial court was not bound to accept these allegations as true, given the language of the *El Niño* settlement agreements themselves, which consisted of two "release agreement[s]" attached to CalFarm's opposition to the demurrer.[2] The first agreement identified Performance Plastering as the subcontractor and stated that the subcontractor agreed to pay Richmond $10,000 on or before June 21, 2001, and in consideration for that payment, Richmond "releases and forever discharges Subcontractor and its insurers . . . from any and all past, present, or future claims, demands, obligations or causes of action . . . which Richmond has or which may later accrue to Richmond with respect to the Claim." The claim was a list of 26 homes in the Rosegarden subdivision in Elk Grove. The release agreement had signature lines for the "subcontractor" and Richmond. The second agreement had language identical to the first agreement with the exceptions of the amount of consideration, which in the second agreement was $47,000, and the claim, which in the second agreement was a list of 39 homes in the Legacy Park subdivision in Elk Grove. Just as with the first agreement, there were signature lines for Richmond and the "subcontractor."

Given the language of these agreements and despite the allegations of the complaint, CalFarm was not a party to the *El Niño* settlement agree-

---

[2] We take judicial notice of the *El Niño* settlement agreements and consider their contents even though they are outside the four corners of the complaint, as there is and can be no factual dispute concerning the contents of the agreements. (See *Joslin v. H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 375 [228 Cal.Rptr. 878].)

ments. (See *Barnett v. Fireman's Fund Ins. Co.*, *supra*, 90 Cal.App.4th at p. 505.) The agreements identified the parties as Performance Plastering and Richmond, and by its terms Performance Plastering was the subcontractor that was to make the monetary payments to Richmond. Nowhere in the settlement agreement was CalFarm even mentioned. As CalFarm was noticeably absent from the *El Niño* settlement agreements, we agree with the trial court that CalFarm was not a party to those agreements.

B

*CalFarm Was a Third Party Beneficiary of the* El Niño
*Settlement Agreements*

Despite the fact CalFarm was not a party to the *El Niño* settlement agreements, we are left with the possibility that CalFarm was a third party beneficiary of those agreements. This possibility arises because, although not mentioned by name, CalFarm was one of a class for whose benefit the *El Niño* settlement agreements were made. (See *General Motors Corp. v. Superior Court* (1993) 12 Cal.App.4th 435, 443–444 [15 Cal.Rptr.2d 622]; *Steve Schmidt & Co. v. Berry* (1986) 183 Cal.App.3d 1299, 1313 [228 Cal.Rptr. 689].) The settlement agreements "release[d] and forever discharge[d] Subcontractor *and its insurers* . . . from any and all past, present, or future claims, demands, obligations or causes of action . . . which Richmond has or which may later accrue to Richmond with respect to the Claim." CalFarm was Performance Plastering's insurer. Thus, under the language of the *El Niño* settlement agreements, CalFarm was a third party beneficiary of Performance Plastering and Richmond's agreements and therefore had standing to sue.

In an attempt to avoid this result, Richmond argues CalFarm cannot go forward on a third party beneficiary theory for two reasons: (1) CalFarm "waived" the allegation it was a third party beneficiary of the *El Niño* settlement agreements because it failed to make this allegation in its pleading or otherwise raise it in the trial court; and (2) the *El Niño* settlement agreements were "invalid and unenforceable." We consider each argument in turn, rejecting both on the merits.

 First, as to the waiver argument, Richmond is simply wrong. A trial court's order sustaining a demurrer without leave to amend is reviewable for abuse of discretion "even though no request to amend [the] pleading was

made." (Code Civ. Proc., § 472c, subd. (a).) While it is the plaintiff's burden to show "that the trial court abused its discretion" and "show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading" (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737]), a plaintiff can make "such a showing . . . for the first time to the reviewing court" (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 711 [113 Cal.Rptr.2d 399]). Here, as CalFarm has demonstrated on appeal that it could amend its pleading to allege that it was a third party beneficiary of the *El Niño* settlement agreements, the trial court abused its discretion in denying CalFarm leave to amend.[3] (See *Aubry v. Tri-City Hospital Dist.*, *supra*, 2 Cal.4th at p. 967.)

This takes us to Richmond's second argument, namely, that the *El Niño* settlement agreements were "invalid and unenforceable" because they were not signed by Performance Plastering and Performance Plastering lacked the capacity to contract as it was (and is) a suspended corporation.[4] We reject this contention because the *El Niño* settlement agreements were merely voidable.

As to the lack of Performance Plastering's signature on the agreements, it is irrelevant. There has been no allegation that the *El Niño* settlement agreements were not fully executed by the parties and, indeed, it was Richmond that accepted $57,000 under the agreements. Simply put, the lack of a party's signature does not make a fully executed contract unenforceable.

As to Performance Plastering's lack of capacity to contract, while it is true a suspended corporation is not allowed to exercise the powers and privileges of a corporation in good standing, including the right to sue or defend a lawsuit while its taxes remain unpaid (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2006) 136 Cal.App.4th 212, 217 [39 Cal.Rptr.3d 33]), the *El Niño* agreements did not mention any pending litigation.[5] As we view them, the *El Niño* settlement agreements were simply general releases of claims given in consideration for money paid. Viewed in this light, the agreements were ordinary contracts entered into between Richmond and Performance Plastering, a suspended corporation.

---

[3] We also note that the purpose behind the "waiver rule," i.e., to give the trial court an opportunity to pass on the issue and alleged error, would not be furthered in this case. Although CalFarm did not allege in its pleading that it was a third party beneficiary of the *El Niño* settlement agreements, the court ruled on its own that CalFarm was not a third party beneficiary of the *El Niño* settlement agreements.

[4] Richmond claims CalFarm has conceded that the *El Niño* (and *Air Design*) settlement agreements were invalid and unenforceable. CalFarm vehemently denies this.

[5] We therefore disregard the allegation in CalFarm's first amended complaint that these agreements had the intent of accomplishing a settlement of pending litigation.

A contract entered into by a suspended corporation is not void but is merely voidable by the other party. (Rev. & Tax. Code, § 23304.1, subd. (a); *Myrick v. O'Neill* (1939) 33 Cal.App.2d 644, 647–648 [92 P.2d 651].) That other party can have the contract declared voidable "only in a lawsuit brought by either party with respect to the contract in a court of competent jurisdiction." (Rev. & Tax. Code, § 23304.5.) Even then, the taxpayer must be "allowed a reasonable opportunity to cure the voidability" before the court's judgment is issued, and "in no event shall the court order rescission of a taxpayer's contract unless the taxpayer receives full restitution of the benefits provided by the taxpayer under the contract." (*Ibid.*)

Here, nothing in the record suggests that Richmond has asked a court for rescission of the *El Niño* settlement agreements nor has it agreed to return the money paid by Performance Plastering under these agreements. On this record, notwithstanding the voidability of the settlement agreements, CalFarm had standing to sue because it was a third party beneficiary of the *El Niño* agreements. The trial court therefore abused its discretion in sustaining the demurrer without leave to amend as to counts two and four.

This leaves the trial court's ruling on CalFarm's standing regarding the *Air Design* settlement agreements, which we address next.

## III

### *The Trial Court Erred in Sustaining the Demurrer as to Counts One and Three Relating to the* Air Design *Settlement Agreement*

CalFarm contends it was a party to the *Air Design* settlement agreement, and therefore had standing to sue on its own behalf. As will be explained, we agree with CalFarm and hold that the trial court erred in sustaining the demurrer as to counts one and three relating to the *Air Design* settlement agreement.

According to the first amended complaint, Richmond filed the *Air Design* lawsuit against Performance Plastering "for alleged construction defects relative to several dwelling units where it had performed work." When CalFarm received notice of the *Air Design* case, Performance Plastering was a suspended corporation. Richmond knew this and "did not serve any summons and complaint upon Performance Plastering in the *Air Design* case, but rather gave notice of its claims and related legal proceedings against Performance Plastering in the *Air Design* case directly to CalFarm, including notice of a settlement conference scheduled in March 2003."

In its opposition to the demurrer, CalFarm attached the transcript of the settlement conference at which the *Air Design* settlement agreement was placed on the record.[6] According to the transcript, present at the settlement conference were attorneys for Richmond and CalFarm along with Richmond and CalFarm "representative[s]." The court made clear CalFarm was not making an appearance on behalf of Performance Plastering. According to the oral "terms and conditions of the settlement," "[i]n return for payment of $8,700,[7] Richmond . . . dismiss[ed] the insured, Performance, of all claims," gave "a full and complete release of any and all claims, known or unknown" "as to the properties identified on [the subcontractor] allocation," "reserv[ed] its right to indemnity" for "any claim" "brought by a third party on account of any work allegedly done by Performance" that was not identified on the subcontractor allocation and agreed to give CalFarm "five business days' notice" "of any potential indemnity claim" and if it did not, "the indemnity claim is lost." When the court asked if there were "[a]ny questions regarding the terms of the settlement as recited or comments by anyone," the response was "No."

Taken together, the allegations in the first amended complaint and recitals in the *Air Design* settlement agreement reflect that CalFarm and Richmond were the only two parties to the *Air Design* settlement agreement. Instead of pursuing the lawsuit against Performance Plastering which, because of its suspended status, could not have defended against the lawsuit, Richmond pursued a settlement with CalFarm.[8] Under the settlement agreement, it was CalFarm that was obligated to pay $8,700 to Richmond in exchange for, among other things, dismissal and release of claims against Performance Plastering (which CalFarm as the insurer would have to pay) and five business days' notice to CalFarm "of any potential indemnity claims."

Nevertheless, Richmond argues that the *Air Design* settlement agreement was invalid and unenforceable for three reasons: (1) Performance Plastering lacked capacity to enter into the agreement; (2) the subcontract agreement stated that any modifications were to be in writing, and the *Air Design*

[6] Just as with the *El Niño* settlement agreements, we take judicial notice of the transcript of the *Air Design* settlement conference even though it is outside the four corners of the complaint, as there is and can be no factual dispute concerning the contents of the transcript. (See *Joslin v. H.A.S. Ins. Brokerage, supra,* 184 Cal.App.3d at p. 375.)

[7] According to the first amended complaint, CalFarm was obligated to pay the $8,700 to Richmond.

[8] CalFarm could pursue the *Air Design* settlement agreement despite our previous holding that CalFarm as the insurer must file a motion to intervene where the insured is a suspended corporation that cannot file or defend a lawsuit on its own. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc., supra,* 136 Cal.App.4th at p. 217.) Here, CalFarm was not negotiating on Performance Plastering's behalf but, rather, was entering into the settlement agreement on its own behalf.

settlement agreement was not in writing; and (3) the *Air Design* settlement agreement failed to contain essential terms. We consider each argument in turn, rejecting them on the merits.

As to Richmond's first argument, it is irrelevant whether Performance Plastering lacked capacity to enter into the *Air Design* settlement agreement because, as we have already explained, it was not Performance Plastering that entered into the settlement agreement, but rather, CalFarm. Performance Plastering was not a party to the agreement.

As to Richmond's second argument, the *Air Design* settlement agreement was not a modification of the subcontract agreement (which was between Richmond and Performance Plastering), but rather, was a separate contract between Richmond and CalFarm.

As to Richmond's third argument,[9] Richmond's position is that the *Air Design* settlement agreement failed to "clearly state" what event triggered the five-day notice provision, failed to "identify what manner of notice must be given," failed to "identify the scope of homes that are subject to the five-day-notice provision" and "[w]ithout answers to these questions, [Richmond] cannot know how it is expected to perform under the agreement."[10]

In support of its position, Richmond cites a series of cases holding that an enforceable contract does not exist when its terms are uncertain or there has been no meeting of the minds about the terms. (See, e.g., *White Point Co. v. Herrington* (1968) 268 Cal.App.2d 458, 465–466 [73 Cal.Rptr. 885]; *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 801 [71 Cal.Rptr.2d 265]; *Terry v. Conlan* (2005) 131 Cal.App.4th 1445, 1459 [33 Cal.Rptr.3d 603].) None of these cases, however, were resolved on a demurrer. (*White Point Co. v. Herrington, supra,* 268 Cal.App.2d at pp. 460, 469 [reversal of an order granting specific performance of an alleged agreement for the purchase and sale of real property]; *Weddington Productions, Inc. v. Flick, supra,* 60 Cal.App.4th at p. 797 [case brought and resolved based on the application of Code Civ. Proc., § 664.6 regarding the "summary procedure for specifically enforcing certain types of settlement agreements by

[9] Richmond takes issue with CalFarm for failing to address this argument in its opening brief. However, as CalFarm correctly points out in its reply brief, this issue (that the *Air Design* settlement agreement was not a valid, enforceable agreement because it failed to contain essential terms) was not a basis for the trial court's ruling on the demurrer.

[10] We note that it was Richmond's attorney who recited the terms of the settlement agreement, and he voiced no concerns when the court asked if there were "[a]ny questions regarding the terms of the settlement as recited." We further note that it was Richmond that took $8,700 pursuant to the settlement agreement.

converting them into judgments"]; *Terry v. Conlan, supra*, 131 Cal.App.4th at pp. 1448, 1461 [reversal of an order enforcing the settlement agreement].)

Here, the issue of the lack of essential terms in the *Air Design* settlement agreement is not properly resolved on demurrer because the settlement agreement is arguably ambiguous on issues such as the meaning of the five-day notice provision, and therefore, we must accept CalFarm's reasonable interpretation of the terms of the settlement agreement in testing the sufficiency of the complaint.[11] (See *Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 239 [282 Cal.Rptr. 233].) This is not to say that a demurrer can never lie to challenge a complaint based on a settlement agreement, the terms of which are objectively uncertain (see, e.g., *Gilmore v. Lycoming Fire Ins. Co.* (1880) 55 Cal. 123, 124) but where, as here, there may be extrinsic evidence of industry practice on such issues as to how the five-day notice provision was to be carried out, Richmond's demurrer could not be properly sustained for lack of essential terms.

Undaunted, Richmond makes a last ditch effort to have us affirm the trial court's order sustaining the demurrer. According to Richmond, even if the *Air Design* settlement agreement was valid and enforceable, CalFarm's first amended complaint failed to state a cause of action for breach of contract for two reasons: (1) according to the transcript of the *Air Design* settlement agreement, Richmond is not prohibited from suing Performance Plastering or CalFarm; and (2) Richmond's filing of a cross-complaint is protected by the litigation privilege. Again, we reject Richmond's arguments.

Richmond's first argument is based on its interpretation of the phrase in the *Air Design* settlement agreement that "if we don't give that notice, the indemnity claim is lost." According to Richmond, this language constitutes only "a *waiver* of claims, a waiver does not constitute a covenant not to sue, and filing a lawsuit in the face of a waiver does not constitute an actionable breach of contract. At best, it may create an affirmative defense."

Richmond's argument fails because there is a reasonable construction of the term "lost" that supports CalFarm's allegations in its first amended

---

[11] According to CalFarm, the notice provision was to be carried out according to "standard practice" in the industry. This included giving CalFarm five business days' notice after any of the following events: (1) Richmond learns that a homeowner is dissatisfied with Performance Plastering's work; (2) a homeowner complains to Richmond about Performance Plastering's work; (3) a warranty claim is submitted to Richmond that implicates Performance Plastering's work; (4) a homeowner sues Richmond and implicates Performance Plastering's work; (5) a judgment is obtained against Richmond that arises out of Performance Plastering's work; or (6) Richmond makes a business decision to sue Performance Plastering. It was also CalFarm's position that, consistent with industry practice, the notice must be "in writing, or at a minimum orally (within the notice period), with a written follow up confirmation within a reasonable time."

complaint. Namely, Richmond's agreement in the *Air Design* settlement that its indemnity claim would be "lost" if it failed to give five business days' notice could be interpreted to mean Richmond would not seek judicial relief on such claims. Because the language in the settlement agreement is reasonably susceptible to this construction, we reject Richmond's argument that the first amended complaint failed to state a cause of action for breach of contract based on Richmond's lawsuit against CalFarm.

■ This brings us to Richmond's second and final argument—that the litigation privilege bars any claim based on its filing of the *Tasker* cross-complaint. As our Supreme Court has recently stated, "The litigation privilege of Civil Code section 47, subdivision (b) (section 47(b)), generally protects from *tort liability any publication* made in connection with a judicial proceeding." (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 952 [56 Cal.Rptr.3d 477, 154 P.3d 1003], italics added.) Here, Richmond is not being sued in tort based on a publication it made in connection with a judicial proceeding. Rather, it is being sued in contract for breaching two settlement agreements. The litigation privilege simply does not apply.

We therefore hold the trial court erred in sustaining the demurrer as to counts one and three based on CalFarm's alleged lack of standing to enforce the *Air Design* settlement agreement.

IV

*The Attorney Fee Award Must Be Reversed*

As Richmond acknowledges, the attorney fee award was based on the prevailing party clause in the subcontract agreement. As Richmond is no longer a prevailing party, the attorney fee award must be reversed.

DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with instructions to vacate its order sustaining the demurrer without leave to amend and to enter a new and different order overruling the demurrer as to the first and third causes of action (both relating to the *Air Design* settlement agreement) and sustaining the demurrer with leave to amend as to the second and fourth causes of action (both relating to the *El Niño* settlement agreements).

The order awarding Richmond attorney fees is reversed.

CalFarm is awarded costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)

Sims, Acting P. J., and Hull, J., concurred.