Filed 10/17/24  Saghian v. U.S. Bank National Assn. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| RICHARD SAGHIAN, | B333544 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV25038) |
| v. | |
| U.S. BANK NATIONAL ASSOCIATION, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara Scheper, Judge.  Affirmed.

Kibler Fowler & Cave, Michael Kibler, Stephen Raiola, and Adam C. Pullano for Plaintiff and Appellant.

Buchalter, Douglas C. Straus, Robert S. Addison, and Efrat M. Cogan for Defendant and Respondent.

Plaintiff Richard Saghian appeals from a judgment of dismissal following a successful demurrer to his second amended complaint brought by defendant U.S. Bank National Association (the Bank).[1]  Plaintiff argues he sufficiently alleged causes of action for promissory estoppel, fraud, and negligent misrepresentation.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I.    Prior Relationship Between the Parties

In 2015, plaintiff became a high-net worth client of the Bank, and by 2022, plaintiff had "long-standing business relationships" with the Bank and the Bank's director, Nader Razavi.  During this time, plaintiff obtained two loans from the Bank through Razavi.  Plaintiff alleges that in each of these prior transactions, rather than issue a formal commitment letter, Razavi "would communicate with [plaintiff] regarding his needs, discuss loan terms with management, and then return with offered material terms, including the interest rate.  [Plaintiff] then locked the interest rate by moving forward with the document collection and underwriting process."

### II.    The 2022 "Rate Commitment"

In 2022, plaintiff sought a loan of approximately $30 million, making inquiries with multiple banks.[3]  Plaintiff

---

[1]     The Bank was formerly known as MUFG Union Bank, N.A.

[2]     Consistent with the applicable standard of review, we draw our statement of facts from the allegations of plaintiff's second amended complaint and matters properly subject to judicial notice.  (*Rallo v. O'Brian* (2020) 52 Cal.App.5th 997, 1002.)

[3]     All subsequent dates are in 2022 unless otherwise stated.

intended to use the loans for "investment activities."  Plaintiff first contacted First Republic Bank, which offered him a loan with a ten-year term fixed at 1.7 percent, followed by a 20-year term at a variable rate.  Through his business manager, plaintiff then asked the Bank if it could offer a loan with similar or better terms.

On April 4, Razavi called plaintiff and informed him the Bank could loan him approximately $30 million to be repaid over 30 years, with a 10-year interest-only term at a fixed 2.25 percent rate, followed by a 20-year variable rate term pegged to a benchmark rate, with an option to pre-pay the loans.  Razavi identified by street address three properties allegedly owned by plaintiff—two residential properties in Los Angeles and one in Malibu—as the loan collateral.  The loan amounts were "[s]ubject to [the] appraised values of [the] properties, [and] if the appraised values did not support a $30 million loan, the highest supported loan amount would be provided."  According to plaintiff, he and Razavi "mutually agreed to all of the above-stated terms."

Two days later, on April 6, Razavi "further documented the terms of the offered loan" in an email to plaintiff and his business manager, Melissa Morton, which stated as follows:[4]

---

[4]     In support of its demurrer, the Bank requested judicial notice of Razavi's April 6 email and plaintiff's responsive email.  Plaintiff did not object to the court taking judicial notice of the emails; in fact, plaintiff quotes part of Razavi's email in his complaint and alleges that Razavi "further documented the terms of the offered loans" in that email.  Because these April 6 emails are not in dispute and are material to our inquiry, we take judicial notice of them.  (Evid. Code, § 452 [judicial notice may be

3

"Good morning Melissa – I would like to introduce you to Rafael Mendez who has worked with [plaintiff] for many years on . . . residential mortgages. Rafael is my right hand partner and our most senior and experienced mortgage officer. He is very familiar with [plaintiff] and will make sure the 3 mortgage requests are done promptly and seamlessly as possible. Rafael will be submitting the 3 mortgages based on the values below. All mortgages are being offered at 2.25% on the 10 [year] fixed, interest only program. Congratulations to Richard and the team!

"1. Primary Home – [address], LOS ANGELES, CA 90069 – [v]alued at $25,000,000

"2. Rental – [address], Los Angeles, CA 90069 – valued at $5,500,000

"3. Vacation Home – [address,] Malibu, 90265 – [v]alued at $17,000,000"

Later that day, plaintiff emailed back, stating "I think [the vacation home] is worth 20m and [rental] is 6m." Razavi responded, "I will gladly give you the max loan I can based on the appraised values."

Plaintiff "understood the expression of 'Congratulations' by Mr. Razavi as that they had a deal regarding the loan," and he "did not continue conversations with First Republic Bank or [seek] any other alternative sources of financing and forwent the opportunity to pursue and close on the First Republic Bank loan."

---

taken of "[f]acts and propositions that are not reasonably subject to dispute"]; *Performance Plastering v. Richmond American Homes of California, Inc.* (2007) 153 Cal.App.4th 659, 670 ["we take judicial notice of the transcript . . . even though it is outside the four corners of the complaint, as there is and can be no factual dispute concerning the contents of [it]"].)

On April 7 and 26, the Bank requested financial records, forms, and authorizations to complete the loan transaction. On April 26, plaintiff's representative responded with the requested documents.

In the interim, "[u]nbeknownst to [plaintiff], on or around April 13, 2022, [the Bank] internally decided to not honor its rate commitment."[5] However, Razavi did not tell plaintiff that the Bank "would not be honoring the Rate Commitment it had made" until early May, after "the Federal Open Market Committee raised the federal funds rate by 50 basis points." Due to the change in the federal funds rate, plaintiff could not obtain a "materially similar loan anywhere else in the market."

## III. The Lawsuit

In August 2022, plaintiff sued the Bank for "breach of loan commitment," promissory estoppel, fraud, negligent misrepresentation, unfair competition, and intentional interference with contractual relations. Plaintiff alleged that the Bank "committed to lend up to $30 million to [plaintiff] at an interest rate of 2.25% but reneged on that commitment." The Bank moved for judgment on the pleadings as to all causes of action in the complaint, and the trial court granted the motion with leave to amend.

Plaintiff then filed a first amended complaint (FAC), asserting claims for breach of loan commitment, promissory estoppel, intentional misrepresentation, negligent misrepresentation, and intentional interference with contractual relations. The Bank demurred to the FAC on the same grounds

---

[5]     Plaintiff cited the Bank's internal communications, obtained through discovery, as a basis for this date.

5

it asserted in its motion for judgment on the pleadings. The trial court sustained the Bank's demurrer to all causes of action in the FAC with leave to amend, again concluding that plaintiff had not sufficiently alleged promissory estoppel, fraud, or misrepresentation because the parties had not identified the loan amounts, and thus there was no clear and unambiguous promise alleged on which plaintiff could have justifiably relied.

## IV. Second Amended Complaint

In May 2023, plaintiff filed the second amended complaint (SAC), the operative pleading in this appeal. The SAC asserted three causes of action: (1) promissory estoppel, (2) fraud, and (3) negligent misrepresentation. The gist of the SAC's factual allegations were largely unchanged from those in plaintiff's prior pleadings. However, plaintiff recast the "loan commitment" as a "rate commitment."

In his first cause of action for promissory estoppel, plaintiff alleged the Bank "made a promise to [plaintiff] that it would process three loans for [plaintiff], all of which 'are being offered at 2.25% on the 10 [year] fixed, interest only program' (the 'Rate Commitment')." The three loans were to be secured by the properties mentioned in the email. Plaintiff alleged that the Bank "reasonably expected and knew that the Rate Commitment would induce action or forbearance" by plaintiff and did induce plaintiff to "discontinu[e] discussions with third parties regarding alternative loan options."

In his second cause of action for fraud, plaintiff alleged that the Bank "made a representation to [plaintiff] that it would offer [plaintiff] three loans in a total of approximately $30 million at an interest rate of 2.25%." The SAC stated: "From mid April to early May, [the Bank] concealed and suppressed a material fact

6

to [plaintiff] regarding its cancellation on the rate commitment it ha[d] previously made to [plaintiff]." Plaintiff alleged the Bank withheld the information so that he "would continue to rely on its promise and representations and would not engage his business with other competitor banks."

The third cause of action for negligent misrepresentation asserted the Bank "made an affirmative representation that it would offer [plaintiff] three loans at an interest rate at 2.25%. [¶] When [the Bank] made that representation regarding the commitment to an interest rate at 2.25%, it was false. [¶] [The Bank] had no reasonable grounds to believe that representation was true when it made that representation to [plaintiff]. [¶] [The Bank] made that representation with the intent that [plaintiff] would rely on it. [¶] [The Bank] knew that [plaintiff] would reasonably rely on its representation and would reasonably expect that [the Bank] honor the rate commitment."

## V. Demurrer to the SAC and the Trial Court's Decision

The Bank demurred to the SAC. The Bank contended that plaintiff could not reasonably have relied on the alleged loan/rate commitment because it was missing material terms and was conditional, citing *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103 (*Peterson*) and other authorities. The Bank likewise contended that both the fraud and negligent misrepresentation causes of action failed because plaintiff could not allege justifiable reliance. In support of its motion, the Bank sought judicial notice of, among other things, the April 6 email communications referenced in the SAC.

The trial court sustained the Bank's demurrer without leave to amend. The trial court concluded:

7

"As in the prior complaints, Plaintiff's cause of action for promissory estoppel fails for lack of reasonable reliance. 'Under the usual principles of lender liability, "[a] loan commitment is not binding on the lender unless it contains all of the material terms of the loan, and either the lender's obligation is unconditional or the stated conditions have been satisfied. When the commitment does not contain all of the essential terms . . . the prospective borrower cannot rely reasonably on the commitment, and the lender is not liable for either a breach of the contract or promissory estoppel." [Citation.] The material terms of a loan include the identity of the lender and borrower, the amount of the loan, and the terms for repayment.' (*Peterson*[, *supra*,] 233 Cal.App.3d [at p.] 115.) Defendant's alleged commitment to Plaintiff did not specify the amount of the loans, as the amount was contingent on the appraised values of the properties. (SAC ¶ 17.)

"Plaintiff cannot avoid the failure to plead reasonable reliance by characterizing Defendant's alleged promise as a 'Rate Commitment' rather than a loan commitment. If a loan commitment that lacks all essential terms of the loan cannot induce reasonable reliance as a matter of law, a commitment to only a single term of the loan – the interest rate – is necessarily insufficient.

"The lack of reasonable reliance also precludes Plaintiff's claims for fraud and negligent misrepresentation. . . .

"Again, Plaintiff has not pled justifiable reliance, because Defendant's representations did not include all material terms of the loan[s] and the promise of an interest rate alone cannot induce reasonable reliance. (SAC ¶ 17.) 'When the commitment does not contain all of the essential terms . . . the prospective

8

borrower cannot rely reasonably on the commitment. . . .' (*Peterson Development Co.*, [*supra*,] 233 Cal.App.3d at 115.)

"At oral argument, Plaintiff's counsel argued that the holding of the *Peterson* court was not as broad as the Court suggests and that *Peterson* is distinguishable on its facts. Plaintiff's counsel argued that in *Peterson*, the plaintiff had only a blank document entitled 'letter of commitment' for permanent financing on which to base his action. In contrast, in the instant action, Plaintiff has e-mail exchanges with Razavi setting forth the interest rate, a loan term, and the three properties that would secure the loan[s]. The Court does not agree with Plaintiff's counsel's characterization of the facts of *Peterson*. In *Peterson*, plaintiff had actually signed the letter of commitment and paid the fee to secure the commitment through escrow. The Court of Appeal found that required terms were not present in the letter of commitment including the identity of the potential borrower, the amount of the loan and the terms of repayment. Here, the amount of the loan[s] w[ere] not stated other than in reference to the three properties and no repayment terms were discussed other than there would be a ten-year fixed term with interest only payments.

"The Court finds that *Peterson* is controlling and therefore sustains the demurrer without leave to amend."

On August 29, 2023, the court entered judgment dismissing the case. Plaintiff timely appealed.

## DISCUSSION

Plaintiff asserts the trial court erred in sustaining the demurrer because the SAC sufficiently pled promissory estoppel, fraud, and negligent misrepresentation. Plaintiff's contentions lack merit.

9

## I.    Standard of Review

"We review an order sustaining a demurrer de novo, applying our independent judgment to assess whether the complaint states a cause of action.  (*Minton v. Dignity Health* (2019) 39 Cal.App.5th 1155, 1161.)  We assume the truth of all properly pleaded facts, as well as all facts that may be implied or reasonably inferred from those expressly alleged, but we do not assume the truth of contentions, deductions, or conclusions of fact or law."  (*Sonoma Luxury Resort LLC v. California Regional Water Quality Control Bd.* (2023) 96 Cal.App.5th 935, 940.)  "We also 'consider judicially noticed matters.' "  (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1315.)

" 'In order to prevail on appeal from an order sustaining a demurrer, the appellant must affirmatively demonstrate error.  Specifically, the appellant must show that the facts pleaded are sufficient to establish every element of a cause of action and overcome all legal grounds on which the trial court sustained the demurrer.' "  (*Save Lafayette Trees v. East Bay Regional Park Dist.* (2021) 66 Cal.App.5th 21, 35.)

## II.    Loan Commitments

The process of applying for and obtaining a loan, has "four fundamental stages:"  (1) "loan application," (2) "lender's acceptance of the application and offer to make the loan (the 'loan commitment,' . . .)," (3) "preparation and finalization of the loan documentation (promissory note, deed of trust and various other security instruments, . . .); and" (4) "loan closing (funding)."  (Greenwald & Bank, Cal. Prac. Guide:  Real Property Trans. (The Rutter Group 2024) "Loan Applications and Loan Commitments" Ch. 6-C, ¶ 6:100.)  The loan commitment stage is at issue here.  "Once the lender approves the borrower's application, it will

10

typically (but not necessarily) send the borrower some form of written 'commitment' to make the loan. A written commitment sets forth the fundamental terms and conditions upon which the lender will make the loan and provides that the lender will hold its commitment open for a certain period of time. [¶] So long as it contains the minimum essential terms (identity of lender and borrower, amount of the loan and repayment terms, . . .), a written loan commitment is binding on the lender, subject to any conditions precedent stated in the commitment." (*Id*. at ¶ 6:130.)

Courts have routinely refused to enforce purported loan offers that did not contain all the essential terms of the loans. In *Peterson*, for example, a builder alleged that a lender orally promised both to make a construction loan to finance a housing project and to provide long-term financing (referred to as a "permanent loan") upon the project's completion. (*Peterson*, *supra*, 233 Cal.App.3d at p. 109.) The builder subsequently signed construction loan documents prepared by the lender that identified the lender's wholly owned subsidiary, TPEC, as the "permanent lender." The builder also signed a "letter of commitment" for long-term financing with TPEC, which stated that a payment of $4,920 would be required for the commitment to provide permanent financing, and construction loan disbursement instructions that allocated a "permanent loan commitment fee" of $4,920 to TPEC. (*Id*. at pp. 108–109.)

The lender issued the builder a $492,000 construction loan pursuant to the construction loan documents. Approximately a year later, when that loan was coming due, the builder asked whether TPEC or its parent would supply the long-term financing for the project; the lender's representative responded that the lender had decided not to offer long-term financing.

11

(*Ibid.*) Ultimately, the builder was unable to obtain long-term financing, and the lender foreclosed on the property. (*Peterson*, *supra*, 233 Cal.App.3d at p. 110.)

The builder sued the lender and TPEC for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and constructive fraud, asserting that it entered into the construction loan agreement because of the representation that long-term financing would be provided for the project, and the letter of commitment constituted a binding contract that was breached when TPEC refused to provide that financing. (*Peterson, supra*, 233 Cal.App.3d at p. 110.) The builder noted that the construction loan agreement required by its terms " 'a letter or other written acknowledgment from the Permanent Lender that the Permanent Commitment is in full force and effect,' " and it defined the "permanent lender" as TPEC. The builder thus urged that the letter of commitment should be deemed an enforceable agreement when read in light of the construction loan agreement. (*Id.* at p. 113.)

The trial court granted summary judgment for the lender and TPEC, and the Court of Appeal affirmed. The appellate court explained that a letter of commitment for which a fee is paid generally constitutes an option for the applicant to obtain a loan at the specified terms, but "[u]nder the usual principles of lender liability, '[a] loan commitment is not binding on the lender unless it contains *all of the material terms of the loan*, and either the lender's obligation is unconditional or the stated conditions have been satisfied. When the commitment does not contain all of the essential terms . . . the prospective borrower cannot rely reasonably on the commitment, and the lender is not liable for either a breach of the contract or promissory estoppel.' (9 Miller

12

& Starr, *op. cit. supra*, § 28.4, at p. 8, fn. omitted.)  The material terms of a loan include the identity of the lender and borrower, the amount of the loan, and the terms for repayment."  (*Peterson, supra*, 233 Cal.App.3d at p. 115, italics added.)

The court concluded that TPEC's letter of commitment was not binding because it did not include all the material terms of the loan.  The court explained:  "First, the identity of the potential borrower is not made clear; the letter contemplates offering financing either to Peterson or to its individual prospective home buyers in the project.  Next, the amount of the loans is not specified; a blank appears where the letter requires specification that 'the aggregate amount of all loans shall not exceed $ _____.'  It is also generally stated that the amount of the loan(s) 'shall be up to 90% of Lender's appraisal or the purchase price, whichever is less.'  The terms of repayment of the loan(s) are nowhere specified in the letter, except that the lender's 'standard interest rate quoted from time to time during the term hereof for comparable loans as of the date the loans are approved by Lender' shall be used.  Similarly vague provisions are stated with regard to amortization and adjustable rate mortgages, while standard provisions are included concerning closing costs, insurance, and documentation."  (*Peterson, supra*, 233 Cal.App.3d at p. 115.)  Accordingly, the court said, "[n]o enforceable contract to provide permanent financing" had been created.  (*Ibid.*)

The court similarly concluded there was no enforceable promise in *Laks v. Coast Fed. Sav. & Loan Assn.* (1976) 60 Cal.App.3d 885, 891 (*Laks*).  There, the plaintiffs received a conditional commitment letter (letter) from the defendant bank for a loan to finance the construction of a hotel.  The letter

13

identified the lender, the maximum amount of the loan, "which must be supported by appraised value with resulting loan to value ratio not in excess of 75%," the interest rate, the loan term, and the applicable fees. (*Id.* at p. 887.) The letter stated, however, that the percentages of financing to be provided by the lender and two other banks was still being negotiated, and who owned the proposed project needed "to be clarified." (*Id.* at p. 888.) When no loan ultimately was consummated, the plaintiffs sued the lender for promissory estoppel, contending that the bank had promised an interim loan to finance construction and a long-term loan. The trial court sustained the lender's demurrer, and the plaintiffs appealed. (*Id.* at pp. 888–889.)

The Court of Appeal affirmed, holding that the letter was not a clear and unambiguous promise on which the plaintiffs, sophisticated parties, could reasonably rely. (*Laks*, *supra*, 60 Cal.App.3d at p. 893.) The court explained that the letter expressly stated that it was a "conditional commitment," and it was silent as to material terms of the loan, including the loan amount, payment schedules, identification of the security, prepayment conditions, terms for interest calculations, and loan disbursement procedures, and rights and remedies of the parties in case of default. (*Id.* at p. 891.) Although "[n]one of these, standing alone, would necessarily make the offer conditional if missing[,] . . . the fact that so many important conditions are absent . . . emphasizes the conditional nature of the letter and strengthens the argument that the parties were still in the negotiation stage." (*Ibid.*) The court concluded: "[The plaintiffs] appear, from the record, to be experienced businessmen. . . . We cannot believe that they did not understand the *conditional offer*

14

to be just that—and that the many essentials referred to were missing. They should have resolved the ambiguities and obtained a finalized agreement and not relied on the [letter].  In other words, they could not have had legitimate expectations that this was a binding offer; therefore, they could not reasonably have relied on it." (*Id.* at p. 893.)

With these legal principles in mind, we turn to the allegations of the present complaint.

## III.  Plaintiff Failed to State a Cause of Action for Promissory Estoppel

The first cause of action alleges a claim for promissory estoppel.  " 'The elements of a promissory estoppel claim are "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." ' " (*Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945.)  " ' "Promissory estoppel applies whenever a 'promise *which the promissor should reasonably expect* to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance' would result in an 'injustice' if the promise were not enforced. . . ." ' " (*Aceves v. U.S. Bank N.A.* (2011) 192 Cal.App.4th 218, 227 (*Aceves*).)  A " 'plaintiff's misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance. . . .  "If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, . . . he will be denied a recovery." ' [Citation.]  A mere 'hopeful expectation[ ] cannot be equated with the necessary justifiable reliance.' " (*Ibid.*)

15

Plaintiff contends that Razavi's April 6 email constituted a clear and unambiguous loan offer on which he reasonably relied.[6] But as in *Peterson* and *Laks*, Razavi's April 6 email did not state the amount of the proposed loans. At most, the email set forth the purported values of the three properties that would collateralize the loans—but as the Bank points out, the email did not specify what percentage of the properties' values (the so-called "loan-to-value ratio") the Bank was willing to loan.[7] Thus, it is uncertain on the face of the email how the property values were to be converted into loan amounts. Further, even had a

---

[6] We note that the SAC recast the alleged "loan commitment" as a "rate commitment." Labels aside, plaintiff's allegation that the Bank committed to giving him loans is central to all of his claims. Therefore, we evaluate the SAC through this lens.

[7] "A 'loan to value ratio' is a comparison between the amount to be loaned and the appraised value of the property." (Greenwald & Bank, Cal. Prac. Guide: Real Property Trans. (The Rutter Group 2024) "Loan Applications and Loan Commitments" Ch. 6-C, ¶ 6:109.) "Lenders are concerned about loan to value ratios because they want to loan only a portion of the total value of the property. The difference between the amount of the loan and the appraised value provides the lender with an equity cushion so that, in the event the lender forecloses and takes back the property, there is sufficient equity to cover expenses—such as costs of foreclosure, lost interest on the loan, the lender's carrying charges while the property is being marketed (taxes, maintenance and insurance, etc.), and the cost of reselling the property (broker commissions and escrow charges). [¶] This equity cushion also provides the lender with some comfort that, even if the property should decrease in value, the loan amount will not exceed the value of the property." (*Id*. at § 6:110.)

loan-to-value ratio been specified, the emails state that the loan amounts would be based not on the values set forth in the emails, but on the properties' *appraised* values, which had not yet been determined.

Plaintiff suggests that the April 6 emails must be considered in light of the April 4 phone call, during which Razavi allegedly said the Bank would extend loans totaling $30 million. But while considering the April 4 phone call and the April 6 emails together arguably clarifies the loan amounts, it renders the loan terms fatally ambiguous. That is, while the April 6 email specifies a 10-year repayment term with an interest rate of 2.25 percent, the SAC alleges that Razavi offered a longer repayment term on April 4—namely, that the loan could be repaid over *30 years*, at a fixed 2.25 percent rate for 10 years, followed by a variable rate for 20 years. Plaintiff does not explain the discrepancy between the length and terms of the loans discussed on April 4 and April 6, nor does he allege on which terms he allegedly relied. And, significantly, neither the April 4 phone call nor the April 6 emails purport to specify how long the Bank would allow plaintiff to take advantage of these rate terms.

In short, plaintiff did not allege that the Bank made an enforceable promise to loan a certain sum. As such, it was manifestly unreasonable for plaintiff, who was a sophisticated businessperson with previous experience in obtaining multimillion dollar loans, to rely on the Bank's "rate commitment." The trial court did not err in so concluding.

Plaintiff attempts to distinguish *Laks* by pointing out that *Laks* involved an expressly conditional offer that had many missing loan terms because the parties were still in negotiations. Plaintiff references Razavi's email to him, which wished him

17

"Congratulations," as an indication that the parties were no longer in negotiations. But as we have said, the loan amounts described in the April 6 email were expressly contingent on future appraisals of plaintiff's properties and were ambiguous as to the repayment periods and terms. Further, Razavi's April 6 email stated that the mortgage officer "will make sure the 3 mortgage *requests* are done promptly and seamlessly as possible. [The mortgage officer] will be *submitting* the 3 mortgages based on the values below." (Italics added.) When read as a whole, the email leads to the inevitable conclusion that the Bank had not promised loans to plaintiff. Rather, the bank communicated to plaintiff that his requests for mortgages were being submitted for approval. Like the financing at issue in *Laks*, the terms remained subject to negotiation.

Plaintiff also argues we should not apply *Peterson*[8] to bar his cause of action for promissory estoppel because "holding that it is unreasonable to rely on any promise that lacks a contract's essential terms would be inconsistent with California law by standing for the proposition that a promissory estoppel claim fails whenever a breach of contract claim fails, rather than creating a separate equitable remedy to cover situations when no contract exists." We do not agree. It is well established that promissory estoppel generally affords the plaintiff equitable relief when there is a clear and unambiguous verbal promise by the

---

[8] *Peterson* did not involve a promissory estoppel claim and disposed of plaintiffs' breach of contract claim at summary judgment. (*Peterson, supra*, 233 Cal.App.3d at p. 107.) That said, we find it instructive with regard to its discussion of lender liability and the reasonable expectations of borrowers.

18

defendant, but a breach of contract cause of action is barred by the statute of frauds or by a failure of consideration. (See *Allied Grape Growers v. Bronco Wine Co.* (1988) 203 Cal.App.3d 432, 444 ["In California, the doctrine of estoppel is proven where one party suffers an unconscionable injury if the statute of frauds is asserted to prevent enforcement of oral contracts."]; *Money Store Investment Corp. v. Southern California Bank* (2002) 98 Cal.App.4th 722, 732 ["The doctrine of promissory estoppel provides a substitute for consideration to allow enforcement of a promise."].) In other words, promissory estoppel remains a viable cause of action even where a breach of contract cause of action fails, as long as the plaintiff can allege all the elements of promissory estoppel.

Significantly, plaintiff fails to cite a case on point that shows that a loan commitment lacking material loan terms can be considered a clear, unambiguous, and reliable promise to support a promissory estoppel claim. Instead, plaintiff cites cases like *Aceves, supra*, 192 Cal.App.4th 218, *West v. JP Morgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780 (*West*), and *Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031 (*Garcia*).

In *Aceves*, the plaintiff filed for bankruptcy protection under chapter 7 of the Bankruptcy Code after falling behind on her monthly mortgage payments. (*Aceves, supra*, 192 Cal.App.4th at p. 223.) Although she had intended to convert the bankruptcy to a chapter 13 proceeding, she decided not to do so after her lender, the defendant bank, promised to work with her on a loan reinstatement and modification if she would not oppose its motion to lift the bankruptcy stay. (*Ibid.*) The plaintiff kept her end of the bargain, but the bank still sold her home at a trustee's sale without ever negotiating with her for the

19

reinstatement and modification of her loan.  (*Ibid*.)  In reversing a judgment dismissing the plaintiff's promissory estoppel claim, the *Aceves* court concluded the promise was "sufficiently concrete to be enforceable."  (*Id*. at p. 222.)

In *West*, the defendant bank promised the plaintiff homeowner that it would review her financial data to determine whether she qualified for a loan modification, and the bank assured the homeowner that no foreclosure sale was pending. (*West*, *supra*, 214 Cal.App.4th at pp. 788–790, 804.)  Two days later, the bank sold her home at a trustee's sale. (*Id*. at p. 790.) The appellate court concluded that plaintiff sufficiently alleged promissory estoppel.  (*Id*. at p. 804.)

In *Garcia*, the plaintiffs contacted their lender to ask for a postponement of a foreclosure sale while they obtained funds to cure their default by refinancing other property they owned.  The lender assured them that the foreclosure would not occur without his approval and agreed to extend the deadline if they needed more time.  (*Garcia*, *supra*, 183 Cal.App.4th at p. 1035.)  The new loan took longer than expected, so the plaintiffs left messages for the lender to let him know.  (*Id*. at p. 1036.)  The foreclosure took place on the original date, unbeknownst to the plaintiffs, who went ahead with the refinancing of their other property.  (*Ibid*.) When they contacted the representative, he stated that there had been a mistake and the foreclosure should not have occurred.  On appeal, this court reversed the trial court's summary adjudication of the plaintiffs' promissory estoppel claim, concluding that plaintiffs had sufficiently shown an enforceable promise.  (*Id*. at p. 1046.)

These cases all involve denials of loan modifications and wrongful foreclosures with regard to plaintiffs who already had

loans with the banks. These cases do not address ambiguous communications missing essential loan terms between lenders and borrowers prior to funding new loans.

Based on the foregoing, we conclude plaintiff has failed to plead both a clear and unambiguous promise, and reasonable reliance.

## IV. Plaintiff Failed to State a Cause of Action for Fraud

Plaintiff next asserts he sufficiently pled fraudulent concealment. "As with all fraud claims, the necessary elements of a concealment/suppression claim consist of ' "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage." ' " (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1185–1186.)

Here, the SAC alleged that (1) the Bank made a rate commitment to plaintiff on April 6; (2) the Bank decided not to honor its rate commitment to plaintiff on April 15; (3) but it was not until May 6, 2022, after the federal funds rate increased, that the Bank told plaintiff that it would not honor its alleged rate commitment. As with the promissory estoppel claim, plaintiff's fraud cause of action hinges on whether plaintiff reasonably relied on the alleged rate commitment. Plaintiff argues, "[f]or the reasons discussed with respect to his promissory estoppel claim, [plaintiff] has sufficiently alleged justifiable reliance, which is a question of fact that should be properly decided by the jury."

We disagree. As explained above, plaintiff could not reasonably rely on the Bank's April 4 and 6 statements regarding rates because the loan amounts and period for which the rates

21

would be offered were not specified.  As plaintiff cannot allege justifiable reliance, he fails to state a cause of action for fraud.

## V.     Plaintiff Failed to State a Cause of Action for Negligent Misrepresentation

Justifiable reliance on the defendant's alleged misrepresentation is also an essential element of negligent misrepresentation.  (*National Union Fire Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50.)  As with the fraud claim, plaintiff argues he alleged adequate reliance based on his promissory estoppel allegations.  For the reasons stated above, plaintiff could not reasonably rely on the alleged rate commitment.  Plaintiff therefore cannot state a claim for negligent misrepresentation.[9]

---

[9]     Plaintiff "concedes that any further amendment would be futile if this Court agreed with the Trial Court's interpretation of *Peterson*."  As we agree with the trial court's interpretation of *Peterson* and we conclude that plaintiff cannot plead a clear and unambiguous promise and reasonable reliance, we do not address the trial court's denial of leave to amend.

## DISPOSITION

The judgment is affirmed.  Respondent U.S. Bank National Association is awarded its costs on appeal.

EDMON, P. J.

We concur:

EGERTON, J.

BERSHON, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.